**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HEALTHCARE DISTRIBUTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>HOWARD A. ZUCKER, in his official capacity as Commissioner of Health of New York; and BARBARA D. UNDERWOOD, in her official capacity as the Attorney General of New York,<br><br>Defendants. | No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Healthcare Distribution Alliance ("HDA"), on behalf of its members, hereby files this complaint against Howard A. Zucker, in his official capacity as Commissioner of Health of New York, and Barbara D. Underwood, in her official capacity as the Attorney General of New York:

## NATURE OF THE ACTION

1.      HDA seeks a declaration that the New York Opioid Stewardship Act (the "Act")[1] is unconstitutional and an injunction against its enforcement.  The Act imposes a punitive surcharge on opioid manufacturers and distributors to finance a $600 million "opioid stewardship fund," accumulated over the course of six years.  The Act contains several unprecedented, unfair, and arbitrary features, including:

  ▪ It seeks to adjudicate legislatively issues that are at stake in ongoing investigations by the State of New York and lawsuits filed by New York City and New York counties.

---

[1] A true and correct copy of the Act is attached hereto as Exhibit A.  Unless otherwise noted, citations throughout are to the Act.

▪ The Act imposes retroactive liability for opioid sales taking place over eighteen months before its effective date.

▪ The Act creates a highly unusual "ratable share" surcharge scheme under which any party's liability depends on the liability assigned to *other* parties.  For example, if manufacturers and distributors restructure their transactions to avoid New York, the ratable shares of the remaining entities in New York will increase (even if their conduct remains unchanged).  If some entities are able to reduce their surcharges by moving transactions to New Jersey, Pennsylvania, and Connecticut, the financial burden on the remaining entities in New York will increase.

▪ The Act improperly singles out entities subject to the surcharge to bear liability for a complex public-health epidemic involving myriad actors.

▪ The Act prohibits a party subject to the surcharge from passing its cost onto any purchaser and imposes a potential penalty of up to $1 million "per incident" for violating this provision.  Given the fungibility of money and the multiple factors that go into pharmaceutical pricing, this vague prohibition invites arbitrary enforcement.

▪ The Act confers untrammeled discretion on the New York Department of Health to interpret and enforce its terms.

2.      The Act's core will be codified as Title 2-A of Article 33 of the New York Public Health Law.  *See* The New York Senate, *Title 2-A: Opioid Stewardship Act*, https://www.nysenate.gov/legislation/laws/PBH/A33T2-A (last visited July 6, 2018).[2]  By its terms, the Act went into effect on July 1, 2018.  *Id.*

### JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the statutes and Constitution of the United States.

4.      This Court has personal jurisdiction over Defendants because Defendants reside within the Southern District of New York.

5.      Venue is proper in this Court because a substantial part of the events giving rise to these claims have occurred or will occur in this district and because Defendants reside in the

_____

[2] The Act also added § 97-aaaaa to the state finance law.

Southern District of New York.  *See* 28 U.S.C. §§ 1391(b)(1)–(2). Members of HDA maintain distribution facilities in the Southern District of New York, including in Orange County.  The Commissioner of Health and the Attorney General maintain offices in New York County.

## PARTIES

6.      HDA is a Virginia 501(c)(6) trade association that represents pharmaceutical wholesale distributors.  In essence, HDA's members purchase pharmaceutical products from manufacturers, store them securely, and deliver them safely to licensed healthcare providers. HDA members ship approximately 15 million diverse medical products across the nation every day.  Its members, in their roles as wholesale distributors, do not manufacture, produce, or prescribe pharmaceutical products, nor do they engage in pharmaceutical research and development.  Rather, they simply coordinate receipt and delivery of pharmaceutical products from the manufacturers who develop them and who, in many cases, market them to pharmacies, hospitals, and other dispensers, who provide them when prescribed.  A substantial part of HDA's mission is to advocate for its members' interests, including through lobbying and litigation. HDA's principal place of business is in Arlington, Virginia.

7.      Howard A. Zucker is the New York Commissioner of Health (the "Commissioner").  The Commissioner serves as the head of the New York Department of Health (the "Department"), N.Y. Pub. Health Law § 206(a) (McKinney 2018), and "enforce[s] the public health law," *id.* § 206(f).  Furthermore, the Department is charged with administering the Act.  *E.g.*, § 3323(4-a).  The Commissioner is a resident of New York and is sued only in his official capacity.

8.      Defendant Barbara D. Underwood is the Attorney General of New York.  Upon the Commissioner's request, the Attorney General has power to "bring an action for an injunction against any person who violates, disobeys or disregards any term or provision of" the New York

Public Health Law.  N.Y. Pub. Health Law § 12 (McKinney 2018).  The Attorney General is a resident of New York and is sued only in her official capacity.

9.      Defendants and those subject to Defendants' supervision, direction, and/or control are responsible for the enforcement of the Act.

10.     In enforcing, administering, and adhering to the Act, Defendants and those subject to Defendants' supervision, direction, and/or control will at all relevant times be acting under color of state law.

## BACKGROUND

**A.      The Act**

11.     On April 13, 2018, the Governor of New York signed into law the Opioid Stewardship Act, which became effective on July 1, 2018.  On June 27, 2018, the Department issued guidance regarding the Act that narrowed and/or clarified the Act in certain respects ("the Guidance").[3]

12.     This Complaint is predicated on the Act as implemented by the Guidance.

13.     The Act imposes a $600 million surcharge on pharmaceutical manufacturers and wholesale distributors to punish those companies for the opioid epidemic, the roots of which are extraordinarily complex and stretch back decades.  The surcharge will be spread over six years, with $100 million paid annually from 2019 through 2024. The first $100 million payment is due on January 1, 2019, and will be assessed on the basis of opioid sales and distributions that occurred in 2017, well before the Act's effective date.

14.     The Act's proceeds are to be kept separate from all other state revenues, § 97-aaaaa(2), and will be allocated exclusively to certain state agencies and state-funded agencies "to

_____

[3] A true and correct copy of relevant portions of the Guidance is attached hereto as Exhibit B.

4

provide opioid treatment, recovery and prevention and education services," as well as "to provide support for the prescription monitoring program registry." § 97-aaaaa(4).

15.     The Act's legislative history indicates a clear intent on the part of New York's Governor and legislature to punish pharmaceutical manufacturers and distributors for allegedly "creat[ing]" the opioid epidemic.  In urging passage of the Act, Governor Cuomo repeatedly revealed this punitive intent, expressing a desire to "hold pharmaceutical companies accountable for perpetuating the [opioid] epidemic" and to "plac[e] the share of societal costs from opioid use on the manufacturers, producers and distributors who financially gain from the use of these drugs."

16.     Perhaps most pointedly, in his 2018 State of the State address, Governor Cuomo expressed his desire "to hold pharmaceutical companies accountable for their role in perpetuating the opioid epidemic."  He expressed his plans to join the Attorney General in "tak[ing] enforcement actions against pharmaceutical opioid distributors for breaching their legal duties to monitor, detect and report suspicious orders of prescription opioids," opining that "wholesale distributors . . . have violated their duty by selling large amounts of painkillers that were then diverted for illicit uses, helping to contribute to the opioid epidemic."

17.     The Act was promulgated against the backdrop of extensive opioid-related litigation against pharmaceutical manufacturers and distributors, along with other participants in the pharmaceutical supply chain.[4]  Through the Attorney General, the State has launched investigations of, among others, pharmaceutical distributors, and New York City and several New York counties have filed opioid-related lawsuits against manufacturers and distributors

---

[4] There have been over one thousand opioid-related cases filed in both state and federal court in the past year and a half, and there are active investigations by attorneys general across the nation.

seeking hundreds of millions of dollars in damages.  The Act circumvents that litigation by legislating the outcomes of those investigations and lawsuits.

18.     This punitive intent is further expressed in the Act's retroactive imposition of liability for opioid sales or distributions taking place over eighteen months before the Act's effective date.  *See* § 3323(5) (providing that the Department will assess the Act's surcharge for 2017 sales or distributions).

19.     Moreover, the Act's funds finance opioid treatment and recovery generally, without distinguishing among legally obtained prescription products, illegally obtained prescription products, and illegal drugs, such as heroin.  The Act therefore seeks to make responsible the politically unpopular (and largely out-of-state) class of manufacturers and distributors without regard to any connection to the alleged harms that more clearly involve numerous other actors.  HDA and its members are committed to playing a responsible role in addressing the opioid epidemic—many HDA members voluntarily spend tens of millions of dollars every year to this end.  But the State has no right to single out distributors for punishment, at least not without due process.

20.     The Act's proceeds are derived from surcharges to be paid by opioid manufacturers and distributors licensed under Title II of New York's public health law ("Licensees").  § 3323(2).  Pharmacies and other supply chain entities, which prior versions of the Act included, are outside the Act's purview.

21.     Each Licensee pays a portion of the opioid fund every year.  *Id.*  The Department determines the portion of the fund for which each Licensee is responsible (the "Surcharge").  § 3323(5)(c).  The Department makes this determination based in part on a formula the Act prescribes (the "Formula"), but regardless of the Formula, the Department may adjust each

Licensee's Surcharge "to account for the nature and use of the product, as well as the type of entity purchasing the product from the licensee." § 3323(5)(a). (This Complaint refers to the Formula, its exceptions, and the nature-and-use adjustment as the "Surcharge-Calculation Provision.")

22.     The Formula is as follows:  Each Licensee's payment corresponds with the percentage of morphine milligram equivalents ("MMEs") it sold or distributed in New York in the prior year. § 3323(5)(a). In other words, to calculate a Licensee's Surcharge, the Department divides the number of MMEs the Licensee sold or distributed by the total number of MMEs all Licensees sold in New York and multiplies the result by $100 million.

23.     The Act defines "distribute" as "to deliver a controlled substance other than by administering or dispensing to the ultimate user, including intra-company transfers between any division, affiliate, subsidiary, parent or other entity under complete common ownership and control." § 3323(1)(c).

24.     This Formula excludes MMEs that are (i) manufactured in New York but whose "final point of delivery or sale" is outside New York, (ii) sold to certain exempted facilities, or (iii) attributable to buprenorphine, methadone, or morphine. § 3323(5)(b). The Guidance indicates that the Department will apply the first exemption to all opioids ultimately delivered or sold outside New York. Guidance at 2.

25.     Every Licensee's Surcharge depends on the liability assigned to *other* Licensees. For example, if manufacturers and distributors restructure their transactions to avoid New York, the Surcharges of the remaining Licensees will increase. If some Licensees are able to reduce their Surcharges by moving transactions to New Jersey, Pennsylvania, and Connecticut, the financial burden on the remaining Licensees in New York will increase.

26.     The Act prohibits Licensees from "pass[ing] the cost of their ratable share amount to a purchaser, including the ultimate user of the opioid." § 3323(2).  The Commissioner may impose a penalty of up to $1 million "per incident" for violating this provision. § 3323(10)(c). (This Complaint refers to this as the "Cost-Pass-Through Prohibition.")

27.     The Cost-Pass-Through Prohibition and the draconian penalty for violating it further evince a punitive intent on the part of the Governor and the New York Legislature.

**B.      There Is a Justiciable Dispute Between the Parties**

28.     The claims raised by HDA in this complaint are fit for judicial decision today, and are not speculative or contingent.  The Act requires Licensees to report their 2017 sales or distributions by August 1, 2018.  § 3323(4-a)(a).  The Department will assess Licensees their Surcharges by October 15, 2018, § 3323(5)(c), and payment of all 2017 Surcharges will be due on January 1, 2019. § 3323(6).

29.     HDA has standing to sue on behalf of its members, some of whom are Licensees subject to the Surcharge.

30.     HDA's purposes include advancing the common interests of pharmaceutical distributors.  HDA fulfills that purpose in part through litigation against governmental authorities to defend HDA's members from damaging laws.

31.     The Act injures pharmaceutical distributors engaged in business in New York by subjecting them to reporting requirements, by forcing them to pay the Surcharge, to rearrange their affairs to comply with the Act, and to attempt to adhere to the Act's opaque terms, and by prohibiting them from passing the cost of the Surcharge downstream to purchasers.

32.     HDA's claims and relief requested herein do not require the participation of HDA's members.

33.     The Act is invalid both on its face and as applied to HDA's members.

## CLAIMS FOR RELIEF

### Count One—Bill of Attainder

34.     HDA repeats and realleges each and every allegation contained in paragraphs 1 through 33 as if fully set forth herein.

35.     The Act is an unconstitutional Bill of Attainder in violation of Article I, § 10 of the U.S. Constitution.

36.     The Act singles out Licensees for punishment.  It does not impose the Surcharge or any similar surcharge on any other entity or person, including prescribing doctors or dispensing providers and pharmacies.[5]

37.     The Act prejudges the guilt of the Licensees.  It improperly imposes liability for alleged past wrongdoing.  *See, e.g.*, § 3323(5) (providing that the Department will assess the Surcharge for 2017 sales).  The Act's legislative history makes this clear: in urging passage of the Act, Governor Cuomo repeatedly referred to his desire "to hold pharmaceutical companies accountable for their role in perpetuating the opioid epidemic."  The Governor also said he planned to join the Attorney General in "tak[ing] enforcement actions against pharmaceutical opioid distributors for breaching their legal duties to monitor, detect and report suspicious orders of prescription opioids," opining that "wholesale distributors in the U.S. . . . . have violated their duty by selling large amounts of painkillers that were then diverted for illicit uses, helping to contribute to the opioid epidemic."  The Act is an attempt to punish opioid distributors for past conduct.

---

[5] The Act's legislative history shows that the Chain Pharmacy Association of New York State convinced the State not to put pharmacies "in the untenable position of paying" the Surcharge, because doing so would be "patently unfair."

38.     The Act therefore supplants legislative judgment for judicial determinations.  The State of New York has launched investigations of pharmaceutical distributors (and others), and New York City and several New York counties have filed opioid-related lawsuits against manufacturers and distributors alleging hundreds of millions of dollars in damages.  The Act seeks to short-circuit the judicial process by legislating the outcomes of these lawsuits.  It demands the same recompense as the pending litigation but accomplishes this objective by stripping pharmaceutical manufacturers and distributors of their due process and other legal protections.  The New York legislature has decided the total amount due ($600 million), who is responsible (manufacturers and distributors), and how the liability should be apportioned (ratable shares of MMEs).  The Act is therefore "trial by legislature."

39.     The Act inflicts punishment in the form of the Surcharge.  As shown by Governor Cuomo's statements and other portions of the legislative record, the Surcharge's purpose is to punish opioid manufacturers and distributors.

40.     The Cost-Pass-Through Prohibition further exposes the legislature's punitive intent, as it makes clear that the legislature intended for manufacturers and distributors alone to bear the cost of the Surcharge.  The penalty for violating the Cost-Pass-Through Prohibition makes this clear.

41.     As a confiscation and deprivation of property, the Surcharge falls within the historical meaning of legislative punishment.

42.     In view of the severity of the Surcharge and of the penalties for violating the Cost-Pass-Through Prohibition, the Act cannot reasonably be said to further a nonpunitive legislative purpose.

43.     The Act does not provide for the protection of a jury trial to Surcharge payers.

## Count Two—Retroactivity Challenge to Surcharge

44.     HDA repeats and realleges each and every allegation contained in paragraphs 1 through 43 as if fully set forth herein.

45.     The Due Process Clause of the Fourteenth Amendment prohibits states from imposing liability retroactively, especially when creating a wholly new realm of liability.

46.     The Act violates this prohibition by imposing liability on Licensees for opioids sold or distributed over eighteen months before the Act's effective date.  Because the Act created a new realm of liability, Licensees had no opportunity at any time during 2017 to alter their behavior in anticipation of the Act.  This retroactive liability is severe and interferes significantly with reasonable, investment-backed expectations.

## Count Three—Takings Clause

47.     HDA repeats and realleges each and every allegation contained in paragraphs 1 through 46 as if fully set forth herein.

48.     The Fifth Amendment provides that "private property" shall not "be taken for public use[] without just compensation."

49.     The Surcharge constitutes an unconstitutional *per se* taking.  It is a confiscation of Licensees' assets.  It requires Licensees to transfer $600 million to the "opioid stewardship fund," thereby vesting title to the money in the State.

50.     Alternatively to paragraph 49, the Surcharge and the Cost-Pass-Through Prohibition operate together as a regulatory taking, as they deprive distributors of the use of the opioid products they distribute in New York.  Distributors use opioid products by selling them. By requiring distributors to pay the Surcharge and forbidding them from passing that added cost along to downstream purchasers, the Act encumbers distributors' ownership interests in those products.

11

51.     Alternatively to paragraphs 49 and 50, the Surcharge and the Cost-Pass-Through Prohibition operate together as a regulatory taking, as they deprive Licensees of the use of the money they pay as Surcharges.  The Cost-Pass-Through Prohibition prevents Licensees from passing the Surcharge downstream to purchasers.

52.     Alternatively to paragraphs 49, 50, and 51, the Surcharge alone is a regulatory taking, as it deprives Licensees of the use of the cost of the Surcharge.

53.     In addition, payment of the Surcharge is an unconstitutional condition to licensure as a controlled-substance distributor or manufacturer.  Compliance with the Act is a condition of licensure.  *See* N.Y. Pub. Health Law § 3390(4) (McKinney 2018) (providing that the Commissioner may revoke the license of a Licensee who "wilfully or negligently fail[s] to comply with any of the provisions of . . . this article, or the regulations promulgated thereunder").  The Surcharge is not proportional to and bears no nexus to any alleged negative impact of Licensees' activities in New York.  The Surcharge is therefore an unconstitutional taking.

54.     In addition, compliance with the Cost-Pass-Through Prohibition is an unconstitutional condition to licensure as a controlled-substance distributor or manufacturer.  Compliance with the Act is a condition of licensure.  *See* N.Y. Pub. Health Law § 3390(4) (McKinney 2018) (providing that the Commissioner may revoke the license of a Licensee who "wilfully or negligently fail[s] to comply with any of the provisions of . . . this article, or the regulations promulgated thereunder").  The Cost-Pass-Through Prohibition forces Licensees to bear the cost of the Surcharge.  This cost is not proportional to and bears no nexus to any alleged negative impact of Licensees' activities in New York.  The Cost-Pass-Through Prohibition therefore makes the cost of the Surcharge an unconstitutional taking.

### Count Four—Substantive Due Process

55.    HDA repeats and realleges each and every allegation contained in paragraphs 1 through 54 as if fully set forth herein.

56.    The Due Process Clause of the Fourteenth Amendment states that no person shall "be deprived of life, liberty, or property, without due process of law."

57.    The Act violates substantive due process by imposing liability on manufacturers and distributors to punish them for alleged past wrongdoing.  The legislative history makes clear that the purpose of the bill was to "hold pharmaceutical companies accountable for perpetuating the [opioid] epidemic," the roots of which stretch back twenty years and are predominately tied to activity in the past.

58.    The Act singles out certain entities to bear this liability without adequately determining culpability.  It forces manufacturers and distributors, but not pharmacies or medical professionals, to pay for alleged harm resulting from a public health problem involving numerous actors.

59.    The structure of the Surcharge demonstrates the State's intent to punish manufacturers and distributors for the opioid epidemic.  For example, instead of assessing a certain cost per pill, the Act sets the value of the fund at $600 million, regardless of the volume of activity in the present.

60.    The Act therefore violates substantive due process by imposing severe liability for alleged past harms without due process and in an arbitrary and capricious manner.

### Count Five—Dormant Commerce Clause Challenge to the Cost-Pass-Through Prohibition Based on Extraterritoriality

61.    HDA repeats and realleges each and every allegation contained in paragraphs 1 through 60 as if fully set forth herein.

13

62.     The dormant Commerce Clause prevents state statutes from regulating extraterritorial commerce, regardless of that commerce's effects in the state.

63.     The Cost-Pass-Through Prohibition directly regulates extraterritorial conduct by prohibiting distributors from passing the cost of the Surcharge "to a purchaser, including the ultimate user of the opioid," regardless of where the opioid is consumed.  § 3323(2).

64.     The Cost-Pass-Through Prohibition is not limited to opioids that pass through New York.  Instead, it is written to encompass transactions with "a purchaser" and with "the ultimate user."  *Id.*  The Cost-Pass-Through Prohibition therefore applies to (a) opioids that pass through New York and are then distributed, sold, or consumed outside New York and (b) opioids that are manufactured, distributed, sold, and consumed entirely outside New York.  In both applications, the Cost-Pass-Through Prohibition regulates transactions that take place outside New York.

65.     As to the former application, the Cost-Pass-Through Prohibition regulates extraterritorial transactions downstream from any opioid transaction in New York.  It prohibits distributors from passing the cost of the Surcharge along to out-of-state purchasers of opioids distributed in New York, even when those purchasers are one or two steps removed from any New York transaction.

66.     As to the latter application, the Cost-Pass-Through Prohibition regulates extraterritorial transactions that are entirely unrelated to New York.  It prohibits distributors from passing the cost of the Surcharge along to "*a* purchaser," irrespective of whether the purchaser in question purchases an opioid that a distributor distributed through New York.  The Cost-Pass-Through Prohibition therefore prohibits distributors from passing the costs of the Surcharge to purchasers of opioids in transactions entirely outside New York.

14

67.     Finally, the Cost-Pass-Through Prohibition is designed to force and has the effect of forcing distributors to pass the cost of the Surcharge upstream to manufacturers.  That is to say, because distributors cannot recoup the Surcharge from downstream purchasers, the Act forces them to seek to recoup the cost of the Surcharge from manufacturers, including out-of-state manufacturers that do not sell directly into New York.  In so doing, the Cost-Pass-Through Prohibition has the effect of indirectly imposing on out-of-state manufacturers surcharges that New York cannot impose directly.  Those surcharges will then be borne by transactions outside New York, requiring out-of-state parties to pay for the surcharge, in violation of the Commerce Clause.

68.     The Act's legislative history confirms the legislature's intent to pass the cost upstream to manufacturers.  For example, during a joint legislative hearing, the Deputy Commissioner of the New York Department of Taxation and Finance referred to the legislature's intent that "the cost of . . . treatment programs should be borne, to the extent we can achieve it, on the manufacturers of opioids."  She later confirmed that "[i]t's the ultimate goal here to impose a surcharge that will flow to the manufacturers of opioids."

**Count Six—Dormant Commerce Clause Challenge Based on Undue Burden**

69.     HDA repeats and realleges each and every allegation contained in paragraphs 1 through 68 as if fully set forth herein.

70.     The Act violates the dormant Commerce Clause because it imposes more than incidental burdens on interstate commerce.  The Act also fails to regulate even-handedly or effectuate a legitimate public interest.  Finally, the Act imposes a burden on interstate commerce that is excessive in relation to its supposed benefits.

71.     The Surcharge and the Cost-Pass-Through Prohibition operate together to burden interstate commerce.  The Cost-Pass-Through Prohibition prevents distributors from passing the

cost of the Surcharge downstream to purchasers, thus forcing them to pass its cost upstream to manufacturers, who in turn may pass it on to out-of-state purchasers.

72.    Many opioid products distributed in New York are manufactured outside New York.  Manufacturers typically do not distribute their products directly into New York; rather, currently, they send their products to distributors outside New York, who in turn deliver them into New York.

73.    Many opioid products distributed in New York are distributed by out-of-state distributors (including distributors with facilities both in and outside New York).

74.    Therefore, insofar as distributors can pass the cost of the Surcharge upstream, the Act burdens out-of-state manufacturers and the distributors' transactions with them.

75.    Furthermore, insofar as distributors are *not* able to pass the cost of the Surcharge upstream, the Act burdens out-of-state distributors with costs that cannot be passed along to downstream purchasers, in New York or elsewhere.

76.    Likewise, the Act may lead distributors to cause manufacturers to ship opioid products directly into New York, such that the manufacturers bear the cost of the Surcharge. Insofar as it does, the Act undoes long-established, efficient logistical mechanisms for distributing pharmaceutical products.  Instead, the Act favors the use of in-state facilities at a higher cost to the distributor.  The Act thus imposes an undue burden on distributors that receive opioid products from manufacturers outside New York.

77.    This scheme effectuates no legitimate local public interest.  Furthermore, the Cost-Pass-Through Prohibition evinces an intent on behalf of the State to protect in-state interests (namely, the interests of dispensing providers and pharmacies) and to punish primarily out-of-state interests (those of manufacturers and distributors).

16

78.     The effects of this scheme on interstate commerce are more than incidental.  The scheme will impose massive costs on out-of-state and interstate transactions.

79.     The burden on interstate commerce this scheme poses is clearly excessive in relation to any putative local benefit.

### Count Seven—Unconstitutional Vagueness Challenge to Surcharge

80.     HDA repeats and realleges each and every allegation contained in paragraphs 1 through 79 as if fully set forth herein.

81.     A statute is unconstitutionally vague if it authorizes arbitrary or discriminatory enforcement.

82.     The Act allows the Department to alter a Licensee's MME count—and therefore its Surcharge payment—"to account for the nature and use of the product" and "the type of entity purchasing the product." § 3323(5)(a).

83.     Furthermore, the Act does not require the Department to explain these alterations, providing only that the Department "shall notify the licensee in writing . . . based on the opioids sold or distributed for the prior calendar year." § 3323(5)(c).

84.     The terms "nature and use" and "type of entity" are unconstitutionally broad and allow the Department to alter MME counts arbitrarily and discriminatorily.

85.     The Act is further unconstitutionally vague in that it allows the Department to alter MME counts without giving the Licensee notice as to how their counts were reached and how the Surcharge applies.

### Count Eight—Unconstitutional Vagueness Challenge to Cost-Pass-Through Prohibition

86.     HDA repeats and realleges each and every allegation contained in paragraphs 1 through 85 as if fully set forth herein.

87.    A statute is unconstitutionally vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

88.    The Cost-Pass-Through Prohibition prohibits distributors from passing the Surcharge's cost "to a purchaser."  § 3323(2).

89.    Because money is fungible, it is all but impossible to determine whether the Surcharge's cost is passed to a purchaser.  Any given increase in any opioid's price may result from myriad business factors.  Likewise, any increase in distributors' costs will ultimately be reflected in their products' prices.  If the costs of production increase for any reason, drug prices may increase in response.

90.    Finally, the Act provides no standards as to how the Department will determine whether a distributor has violated the Cost-Pass-Through Prohibition.  The potential penalties of $1 million "per incident" create the risk of astronomical liability and give the Department an improper amount of leeway in implementing this provision, creating an unconstitutional risk of arbitrary and discriminatory enforcement.

* * *

91.    The Act's enforcement and administration are and will be under color of state law and violate the constitutional rights, privileges, and immunities of HDA's members.  The Act is therefore actionable under 42 U.S.C. § 1983.

92.    HDA's members have no adequate remedy at law available against Defendants for the infringement of their constitutional rights.

## REQUEST FOR RELIEF

WHEREFORE, HDA respectfully prays that this Court:

(1)    declare the Act unconstitutional,

18

(2)     permanently enjoin Defendants and their agents, servants, employees, and all persons in active concert or participation with them from taking any action under or to enforce the Act,

(3)     award HDA reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, and

(4)     grant HDA such additional or different relief as it deems just and proper.

Dated: July 6, 2018

Respectfully submitted,

By:      */s/ John Calandra*
           John Calandra

John Calandra
McDermott Will & Emery LLP
340 Madison Avenue
New York, NY 10173
(212) 547-5400
jcalandra@mwe.com

M. Miller Baker (*pro hac vice to be filed*)
Stephen P. Kranz (*pro hac vice to be filed*)
Diann Smith (*pro hac vice to be filed*)
Sarah P. Hogarth (*pro hac vice to be filed*)
Eric Hageman* (*pro hac vice to be filed*)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
mbaker@mwe.com
skranz@mwe.com
dlsmith@mwe.com
shogarth@mwe.com
ehageman@mwe.com

*Counsel for Healthcare Distribution Alliance*

*\*Admitted in North Carolina. Not yet admitted in the District of Columbia. Supervised by principals who are admitted to the DC bar.*